

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 23, 2019

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States v. Jorge Rodriguez Lopez*, 18 Cr. 868 (SHS)

Dear Judge Stein:

The defendant in this case, Jorge Rodriguez Lopez, is scheduled to be sentenced on May 30, 2019, at 9:00 a.m., having pleaded guilty to conspiracy to distribute and to possess with the intent to distribute a fentanyl analogue, oxycodone, hydrocodone, and U-47700, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C).  The Government respectfully submits this letter in advance of the sentencing. The parties stipulated in a plea agreement that the defendant has a total offense level of 23 and a criminal history category of I, which results in a United States Sentencing Guidelines ("Guidelines") range of 46 to 57 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons set forth below, the Government submits that a sentence within the Stipulated Guidelines Range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A.  Offense Conduct**

This case arises from an investigation of the sale of controlled substances through various websites purporting to be online pharmacies. PSR ¶ 9. Members of the conspiracy shipped hundreds of orders of controlled substances to customers located throughout the United States. *Id.* In some cases, the customers purchased what they believed to be prescription drugs such as alprazolam or oxycodone, but instead received Schedule I narcotics such as U-47700, a synthetic opioid with characteristics similar to fentanyl.[1]  *Id.*  The investigation connected the websites to

---

[1] Although it is not technically a fentanyl analogue, U-47700 is a powerful and dangerous synthetic opioid. It has "pharmacological effects similar to fentanyl and morphine." Drug Enforcement Administration, *Placement of Butyryl Fentanyl and U-47700 Into Schedule I*, Final Order, April 20, 2018, available at https://www.deadiversion.usdoj.gov/fed_regs/rules/2018/fr0420.htm. The DEA has reported that "U-47700 has been associated with numerous cases of overdoses and overdose deaths." *Id.*

the overdose death of an individual in Boise, Idaho, who had ordered oxycodone from the websites and whose death was due to elevated levels of multiple opioids, including fentanyl. PSR ¶ 12. In the course of the investigation, law enforcement agents conducted a number of purchases of pills from the websites. PSR ¶¶ 14-20. The defendant worked with a co-conspirator based in New Jersey to ship these pills and receive the payments for them. PSR ¶ 19, 24. The investigation identified over $150,000 in narcotics proceeds deposited into an account used by the defendant, and an additional more than $600,000 in narcotics proceeds that were deposited into accounts used by his co-conspirator. PSR ¶¶ 19-20, 28-29.

The defendant's role was to maintain a substantial distribution center for pills that were sold over the sham online pharmacy websites. He and his co-conspirator stored large quantities of pills, shipped pills to customers throughout the United States, and received payments for the pills and deposited them in various bank accounts. PSR ¶ 10. At the time of his arrest, the defendant was in possession of over 100,000 pills located in his apartment, along with materials for shipping these pills around the United States. PSR ¶ 39. These pills tested positive for U-47700, p-fluoroisobutyryl fentanyl, fentanyl, hydrocodone, and oxycodone, among other substances. *See* PSR ¶ 45. He subsequently acknowledged that he had participated in the conspiracy for approximately six months, shipping approximately 15 or more shipments of pills per week during that time period. PSR ¶ 39.

### B.  Procedural History

On December 6, 2018, the defendant entered a plea of guilty, pursuant to a plea agreement, to conspiracy to distribute a fentanyl analogue, oxycodone, hydrocodone, and U-47700, with a stipulated guidelines range of 46 to 57 months' imprisonment. On February 28, 2019, the United States Probation Office issued the presentence report in this case, which calculates the applicable guidelines range to be 57 to 71 months' imprisonment and recommends a sentence of 48 months' imprisonment (the "Guidelines Range"). PSR at 17.[2] On May 16, 2019, the defendant filed a sentencing submission arguing for a below-guidelines sentence of one year and one day. The defendant principally argues that his lack of criminal history, his family support in Honduras, and the conditions of confinement in the MDC weigh in favor of a below-guidelines sentence.

### C.  Discussion

The most important sentencing factors in this case are the need to reflect the seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to this defendant and other similarly situated individuals.  *See* 18 U.S.C. § 3553(a)(2)(A)-(C).  All of these considerations weigh in favor of a sentence within the Stipulated Guidelines Range of 46 to 57 months.

---

[2] The presentence report assigns the defendant a higher quantity of narcotics than the quantity set forth in the plea agreement, which results in a higher Guidelines Range. This is because there was additional laboratory testing of pills found in the defendant's apartment after the parties entered the plea agreement, which resulted in a higher quantity of narcotics attributable to the defendant. PSR ¶ 39.

The Stipulated Guidelines Range reflects the seriousness of the defendant's conduct, which involved trafficking in tens of thousands of pills, including pills that tested positive for extremely dangerous controlled substances such as fentanyl, a fentanyl analogue, and U-47700. The defendant played a significant role in moving these drugs and participated in the conspiracy for approximately six months. He agreed to use his residence as a major distribution center, storing a large quantity of pills there. The defendant filled orders for customers around the country, received payments, and deposited the proceeds in a bank account set up in a fictitious person's name, which made his conduct more difficult to detect. His conduct assisted the conspiracy to reach a broad base of drug users throughout the country. Although the defendant's personal conduct is not directly linked to the overdose death that occurred in March 2017, *see* PSR ¶ 12, that incident underscores the dangerous and serious nature of the defendant's conduct. A sentence within the Stipulated Guidelines Range would serve to provide just punishment for the defendant's conduct and to deter him and others from making the decision to participate in the drug business.

The defendant argues that the conditions of the defendant's confinement at MDC Brooklyn warrant consideration in fashioning a sentence. In the Government's view, although the conditions were undoubtedly unfortunate and harsh, they do not rise to the severity of those conditions this Circuit has recognized as warranting a downward departure. The Second Circuit has recognized that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States* v. *Carty*, 264 F.3d 191, 196 (2d Cir. 2001). However, the Second Circuit in the same opinion indicated that such departures are applicable only where the conditions of pre-sentence confinement were so severe as to take a particular case outside the heartland of the applicable Guideline. *Id.*

The conditions of confinement at the MDC do not rise to the "exceptional degree" and "severity…upon the defendant in some highly unique or disproportionate manner" contemplated by the caselaw. In *Carty*, the defendant was detained for approximately eight months in a Dominican prison, where he claimed he was held in a four-foot by eight-foot cell with three or four other inmates, there was no light in his cell, he received ten to fifteen minutes per day outside of his cell to bathe, his only toilet was a hole in the ground, and he lost forty pounds during that time as a result. *Carty*, 264 F.3d at 193. The other cases cited by the defendant are similarly distinguishable, as they involved detention in exceptionally harsh conditions in foreign countries or exceptionally long pretrial detention in the MCC. *See* Deft. Submission at 5 n. 4.

The defendant does cite the sentencing transcript in *United States v. Ozols*, No. 16 Cr. 692 (JMF) (S.D.N.Y. Feb. 12, 2019), in which the court stated that it would give the defendant "some credit" for conditions at the MDC. Ultimately, however, the sentence imposed in Ozols was 39 months, which was just two months below the low end of the parties' stipulated guidelines range of 41 to 51 months.[3] Additionally, the Court cited a number of other factors for imposing a sentence below the guidelines range in *Ozols*, so it is unclear from the record what amount of "credit" was due to the conditions at the MDC. At most, therefore, *Ozols* stands for the proposition that the Court may take the MDC conditions into account when considering a sentence, but the

---

[3] In *Ozols*, as in this case, the PSR calculated a guidelines range that was higher than the parties' stipulated range.

Government submits that the conditions at the MDC do not warrant a substantial variance from the Stipulated Guidelines Range.

For all of these reasons, the Government submits that a sentence within the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

by: _____
Thane Rehn
Assistant United States Attorney
(212) 637-2354